IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BERIN LOCKWOOD, Individually and on behalf of Class Members,<br><br>Plaintiff,<br><br>v.<br><br>FULL SPECTRUM LENDING, INC. and COUNTRYWIDE HOME LOANS, INC.,<br>Defendants | Civil Action No. 05-10647-MLW |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION, DISMISS OR
STAY LITIGATION, AND DISMISS CLASS ALLEGATIONS**

The plaintiff opposes the defendants' Motion for the following reasons:

1.      There was no mutuality of contract nor delivery with regard to the so-called "Mutual Agreement to Arbitrate Claims" ("Arbitration Agreement").

2.      The plaintiff was fraudulently induced to execute documents, including the Arbitration Agreement, which should not be enforced.

3.      The Arbitration Agreement is a contract of adhesion and unconscionable and violates Massachusetts public policy.

4.      The arbitrator named in the Arbitration Agreement is biased and prejudiced against consumer borrowers, such as the plaintiff.

5.      M.G.L. Chapter 93A requires that waivers of substantive rights afforded by consumer protection laws be clearly and unequivocally disclosed and that in order to be enforceable, consumers must know what they are waiving to be enforceable.

**1.      THERE WAS NO MUTUALITY OF CONTRACT WITH REGARD TO THE SO-CALLED "MUTUAL AGREEMENT TO ARBITRATE CLAIMS" ("ARBITRA-TION AGREEMENT") OR DELIVERY OF SUCH AGREEMENT.**

The Arbitration Agreement must be viewed and constructed pursuant to the laws of the Commonwealth of Massachusetts as it involves the consumer protection laws arising out of the purchase and financing of the plaintiff's home and primary residence in Massachusetts. The Arbitration Agreement was neither executed by the defendants nor delivered to the plaintiff, which makes it a voidable agreement.

The Arbitration Agreement is presented to court as a separate agreement, otherwise its terms would have to be contained in the mortgage documents (promissory note and mortgage). The Arbitration Agreement should not be enforced because there was no mutuality of obligations. See, Morad v. Silva, 331 Mass. 942 (1953).

The Arbitration Agreement has Mr. Cliff Kitashima's name typed in under the date of 8/26/04 for the defendants but no actual signed, executed agreement, or even a copy thereof, was delivered to the plaintiff. See annexed Affidavit of plaintiff. Delivery of a written contract is a required contractual element. See, Golden v. The Equitable Life Assurance Society of the U.S., 293 Mass. 286 (1936).

The plaintiff, in the Arbitration Agreement waives the right to seek any class action and even if the defendant, *arguendo*, waives this right, such waiver is hollow at best where it is extremely unlikely that a defendant lender would ever file a class action against consumer borrowers? The mutuality is fatally lacking in this area as well. Accordingly, the Arbitration Agreement should not be enforced against the plaintiff.

**2.    THE PLAINTIFF WAS FRAUDULENTLY INDUCED TO EXECUTE DOCU-MENTS, INCLUDEING THE ARBITRATION AGREEMENT, WHICH SHOULD NOT BE ENFORCED.**

The Affidavit of the plaintiff (annexed hereto) clearly establishes the elements of fraudulent inducement.

Arbitration agreements may be set aside if they are fraudulently induced.  See, Johnson v. West Suburban Bank, 225 F.3d 366 (3rd Cir. 2000).

Fraud is defined as a misrepresentation of a material fact made with knowledge of its falsity (or intentional ignorance of the truth) with the intention that it be acted on by the party deceived with the misrepresentation justifiably relied upon by the person to his injury.  Turner v. Johnson & Johnson, 809 F.2d 90 (1st Cir. 1986).  The contract will be avoided if the elements of fraud are established.  Benjamin Foster Co. v. Com., 318 Mass. 190, 198, 61 N.E.2d 147, 151 (1945).

The party plaintiff entered into the mortgage loan and the Arbitration Agreement as a result of the false statements of the defendants' employee, Harold Bean, and Mr. Bean's misrepresentations "materially influenced" the plaintiff to enter into the contract.  McGrath v. C.T. Sherer Co., 291 Mass. 35 (1935).

Failure to disclose information, however, may be an unfair or deceptive act under M.G.L. c. 93A.  See, 940 CMR §3.16(2).  The consumer protection laws were violated as, for example, no good faith estimate (required by Regulation X) was provided to the plaintiff prior to the closing.

The courts have long held that contracts created by fraud should not be enforced, as the contract is against public policy; the freedom to contract does not extend to the situation where on party has used fraud to obtain the consent of the other party.  Bates v. Southgate, 308 Mass. 170, 182-183, 31 N.E.2d 551 (1941).

Where the Arbitration Agreement was a product of the defendants' employee's misrepresentation, it should not be enforced against the plaintiff.

**3.    THE ARBITRATION AGREEMENT IS A CONTRACT OF ADHESION AND UNCONSCIONABLE AND VIOLATES MASSACHUSETTS PUBLIC POLICY.**

**It is submitted that under generally applicable Massachusetts consumer protection laws, a provision in a contract of adhesion that prohibits class actions is unconscionable.**

A ban on class actions would be unconscionable under generally applicable Massachusetts consumer protection laws. Once this conclusion is established, then the only question becomes whether, as stated by the defendants, that the Federal Arbitration Act ("FAA") overrides state law when such a provision is incorporated into an arbitration agreement.

A regulation of the Attorney General promulgated under the Consumer Protection Act offers consumers in Massachusetts is a potent additional way of obtaining relief from unconscionable contracts. This regulation declares that, notwithstanding any other rule, regulation or statement, an act or practice is a violation of the Consumer Protection Act and therefore subject to all of its remedies if it is "oppressive or otherwise unconscionable in any respect." 940 CMR §3.16(1). Accordingly, the defendants' contractual ban on class actions is substantively unconscionable because it effectively serves as an exculpatory clause.

The public policy is also that parties with superior bargaining power may <u>not</u> impose exculpatory clauses upon others in adhesion contracts. Also, Massachusetts law and policy require waivers of rights to be much more conspicuously stated and in bold type face than other terms, which was not done by the defendants. See, for example, M.G.L. Chapter 140D, Section 8 which states how large the type must be to be deemed conspicuous.

The Ninth Circuit, applying California Law and armed with a rich factual record, expanded even further on this phenomenon. In <u>Ting v. AT&T</u> (9th Cir. 2003) 319 F.3d 1126, the Ninth Circuit found that AT&T's prohibition on class actions was one-sided and non-mutual. See also, <u>Szetela v. Discovery Bank</u>, 97 Cal. App. 4th 1094 (2002) (which holds that class action waiver is unconscionable under California Law).

The doctrine of unconscionability has long been recognized by the Commonwealth of Massachusetts; in fact, the doctrine dates back to English common law. Banaghan v. Malaney, 200 Mass. 46, 85 N.E. 839 (1908); 15 S. Williston Contracts § 1632 (3d ed. 1972); Home v. United States, 132 U.S. 406, 411, 10 S.Ct. 134, 136, 33 L.Ed. 393 (1889), (quoting Earl of Chesterfield v. Janssen, 38 Eng. Rep. 82, 100 (Ch. 1750). There is a two-part test for unconscionability: (1) determining whether there was no meaningful choice on the part of one of the parties; and (2) contract terms which are unreasonably favorable to the other party. Zapatha v. Dairy Mart, Inc., 381 Mass. 284 408 N.E. 2d 1370, 1380 (Mass. 1980).

The doctrine of unconscionability has also been adopted in the Uniform Commercial Code. M.G.L. Chapter 106, § 2-302. Unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party.

There were no negotiations as to the defendants' terms of the home mortgage loan and Arbitration Agreement, as it was clearly a "take it or leave it" deal and it was a classic contract of adhesion where the defendants had all the bargaining power and the plaintiff was unable to make any changes or amendments thereto.

It is submitted that the Arbitration Agreement is unconscionable and offends Massachusetts public policy and should not be enforceable. See, Carpenter v. Suffolk Franklin Savings Bank, 370 Mass. 314 (1976).

**The contractual ban on class actions is substantively unconscionable because it is one-sided and effectively non-mutual.**

The law is clear in Massachusetts that parties with superior bargaining power may not impose one-sided, non-mutual arbitration clauses upon weaker parties. A number of courts have applied this rule about one-sided contracts to consumer contracts. In Flores v. Transamerica

Homefirst, Inc., (2001) 93 Cal. App. 4th 846, 113 Cal. Rptr. 2d 376, an arbitration clause in a "reverse mortgage" loan bound borrowers for all claims but exempted the lender's claims involving foreclosure, self-help remedies and receivership.  The court found that "[a] practical matter, by reserving to itself the remedy of foreclosure, Homefirst has assured the availability of the only remedy it is likely to need," that "Homefirst has attempted to maximize its advantage by avoiding arbitration of its own claims," and that the arbitration clause was therefore unconscionable absent a justification for this advantage.  *See also*  Acorn v. Household Int'l, Inc., (N.D. Cal. 2002) 211 F. Supp. 2d 1160, 1173 (arbitration clause in home equity loan is unconscionable in part based on exclusion of lender's foreclosure remedies);  Luna v. Household Finance Corp. III (W.D. Wash. 2002) 236 F.Supp.2d 1166 (same , applying Washington contract law); Iwen v. U.S. West Direct (Mont. 1999) 977 P.2d 989 (arbitration clause binding telephone company's advertising customers but not its own customers unconscionable); State ex rel Dunlap v. Berger, 567 S.E.2d 265, 280 n. 12 ("Dunlap") (arbitration clause's reservation of retailer's judicial collection and repossession actions provides adequate grounds for finding clause substantively unconscionable).

**The FAA does not preempt the generally applicable principles of Massachusetts law which holds that bans on class actions, when class actions are specifically authorized by Massachusetts consumer protection statutes, are unconscionable.**

There is a heavy presumption against finding federal preemption of state law.  Because preemption constitutes a radical intrusion on a state's power, the U.S. Supreme Court has long recognized a strong presumption against preemption of state laws.  Particularly where "federal law is said to bar state action in fields of traditional state regulation, we have worked on the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  California Div. of Labor

Standards Enforcement v. Dillingham Construction, N.A., Inc., (1997) 519 U.S. 316, 325 (quoting Rice v. Santa Fe Elevator Corp. (1947) 331 U.S. 218, 230).

Massachusetts common law of contracts, unconscionability and unfair trade practices are disciplines of traditional and virtually exclusive state regulation.  *See, e.g.,* Erie Railroad Co. v. Tompkins (1938) 304 U.S. 64, 78 ("Congress has no power to declare substantive rules of common law applicable in a state. . .").

Where a federal statute has no express preemption provision and where a federal statute does not preempt an entire field, state law will only be preempted if there is an "actual conflict" between federal and state law, either because it is "impossible for a private party to comply with both. . .requirements" or because the state laws "stand[] as an obstacle to the accomplishment and execution of the full purposes of Congress." Freightliner Corp. v. Myrick (1995) 14 U.S. 280, 287 (citations omitted).  This standard is not easily met and, in particular, there cannot be implied conflict preemption where there is no federal law standard addressing the subject of state law regulation.

**The FAA only preempts those state laws that would frustrate the Act and it contains an explicit savings clause for generally applicable state law.**

The FAA has no express preemption provision and does not reflect a congressional intent to occupy the entire field of arbitration or contract law.  Volt Info Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ. (1989) 489 U.S. 468, 477.  Therefore, the FAA only preempts state laws whose application would frustrate the will of Congress by undermining the Act's policy goals.  *Id.* at 477-78.  Southerland v. Keating, 465 U.S. 1 (1984).

In addition, the FAA incorporates a savings clause that provides that arbitration clauses will not be enforced if there are grounds under state contract law for invalidating the clause.  9 USC § 2.  The U.S. Supreme Court has recognized that the defense of unconscionability is

available to a party challenging an arbitration agreement. <u>Doctor's Assocs., inc. v. Casarotto</u> (1966) 517 U.S. 681, 687 ("[G]enerally applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening [the F.A.A.].").  In other words, state contract law applies to arbitration clauses.  This principle is incorporated into the federal substantive law of arbitration. <u>Perry v. Thomas</u> (1987) 484 U.S. 483, 492-93 ("An agreement to arbitrate is. . .enforceable, *as a matter of federal law,* 'save upon such grounds as exist at law or in equity for the revocation of any contract.'. . . Thus state law, whether legislative or judicial origin, is applicable if that law arose to cover issues concerning the validity, revocability, and enforceability of contracts generally.") [emphasis in original, citations omitted].  Likewise, this Court has also recognized that a court may refuse to enforce *any* facially valid contract on the ground that it is unconscionable.  ("Because unconscionability is a reason for refusing to enforce contracts generally, it is also a valid reason for refusing to enforce an arbitration agreement.").

**Massachusetts law of unconscionability, as applied to contractual bans on consumer protection class actions, is generally applicable state law that falls within the FAA's savings clause.**

Massachusetts law preventing corporations from banning class actions in contracts of adhesion is a generally applicable rule of law.  The rule that contracts of adhesion drafted by the party with superior economic power are procedurally unconscionable applies to all contracts, whether they include arbitration clauses or not.

A number of other courts have held that contractual waivers of class actions in arbitration clauses are unconscionable. <u>See</u> 9 U.S.C. § 2; <u>see also, e.g.,</u> <u>Hooters of Am., inc. v. Phillips</u>, 173 F.3d 933, 940 (4th Cir. 1999); <u>Hudson v. Chicago Teachers Union Local No. 1</u>, 743 F.2d 1187, 1195 (7th Cir. 1984); <u>Graham v. Scissor-Tail</u>, 623 P.2d 165, 177 (Cal. 1990); <u>Cheng-</u>

Canindan v. Renaissance Hotel Assocs., 57 Cal. Rptr. 2d 867, 874-77 (Cal. Dist. Ct. App. 1996);

Ditto v. Re/Max Preferred Properties, Inc., 861 P.2d 1000, 1004 (Okla. Ct. App. 1993) Cross &

Brown Co. v. Nelson (In re Cross & Brown Co., 167 N.Y. S.3d 573, 575 (N.Y. App. Div. 1957).

  The Alabama Supreme Court found a contract term banning class actions built into an

arbitration clause to be unconscionable.  *See* Leonard v. Terminix Int'l Co. (Ala. Oct. 18, 2002)

2002 WL 31341084 (petition for rehearing denied).  The Court made a point of noting that such

a ban affects rich and poor alike, as it forecloses *all* individual plaintiffs from bringing a claim

where the expense of arbitrating is greater than the amount in controversy.  "That the expenses of

arbitration would exceed the amount in controversy is not a problem personal or peculiar to any

particular consumer but is, rather, a phenomenon inherent in the transaction itself."  Leonard,

202 WL 31341084 at 7.  By "foreclosing the Leonards from an attempt to seek practical redress

through a class action and restricting them to a disproportionately expensive individual

arbitration," the Court found that the defendants had essentially closed the door of justice to

these consumers.  *Id*. at *8.  Thus, the arbitration clause was unconscionable.

  Similarly, in Dunlap, 567 S.E.2d at 278, the West Virginia Supreme Court of Appeal held

that an arbitration clause which effectively barred class actions under state law was

unconscionable.  The court's reasoning was rooted in the State's longstanding law prohibiting

exculpatory clauses in contracts of adhesion:

> Based on all of the foregoing and in fidelity to the approach that we have taken in
> this area, we recognize and hold that exculpatory provisions in a contract of
> adhesion that if applied would prohibit or substantially limit a person from
> seeking and obtaining vindicating rights and protections or from seeking and
> obtaining statutory or common law relief and remedies that are afforded by or
> arise under state law that exists for the benefit of the public are unconscionable;
> unless the court determines that exceptional circumstances exist that make the
> provisions conscionable.

  In State ex rel Dunlap v. Berger, 567 S.E. 2d at 265, the Court explained that in light of

the modest claims at issue, the defendant's contractual ban on class actions was effectively an

unconscionable exculpatory clause.  "In Mr. Dunlap's case, the total of $8.46 in insurance charges that Friedman's added to his purchase price by Friedman's is precisely the sort of small-dollar/high volume (alleged) illegality that class action claims and remedies are effective at addressing."  The Court went on to find that "[i]n many cases, the availability of class action relief is a *sine quo non* to permit the adequate vindication of consumer rights."  The Court warned that "[t]hus, in the contracts of adhesion that are so commonly involved in consumer and employment transactions, permitting the proponent of such a contract to include a provision that prevents an aggrieved party from pursuing class action relief would go a long way toward allowing those who commit illegal activity to go unpunished, undeterred, and unaccountable." Dunlap, 567 S.E.2d at 278-79.

A number of other courts have reached the same conclusion.  *See* Luna, 236 F.Supp. 2d 116, 1179 ("Here, the prohibition on class actions allows the Arbitration Rider to be 'used as a sword to strike down access to justice instead of a shield against prohibitive costs.'  This finding weights heavily in favor of a finding of substantive unconscionability."  (citations omitted); Comb. v. Paypal, 218 F. Supp.2d 1165, 1176-1177 (following Szetela and finding arbitration clause unconscionable, in part because it prohibited collective actions; rejecting argument of FAA preemption in light of the Ninth Circuit's decision in Ticknor); ACORN v. Household Intnat'l, Inc., 211 F. Supp.2d at 1170-1171 (following Szetela and the district court opinion in Ting, holding that an arbitration clause that prohibited class actions was unconscionable); Powertel v. Bexley (Fla. App. 1 Dist. 1999) 743 So. 2d 570, 576 ("By requiring arbitration of all claims, Powertel has precluded the possibility that a group of its customers might join together to seek relief that would be impractical for any of them to obtain alone."): Bailey v. Ameriquest Mortgage Co. (D.Minn. Jan. 23, 2002) 2002 WL 100391, *7 ([T]he inability to proceed collectively . . . has the effect of rendering a plaintiff's individual claims impractical to pursue.

The right to proceed collectively is particularly critical to these plaintiffs, who, as previously mentioned, have relatively small individual claims."); and In re Knepp (N.D. Ala. 1999) 229 B.R. 821, 827 ("The pervasive use of arbitration agreements in consumer contracts could have the effect of eliminating class actions. If class actions are no longer an option, the vast majority of consumer claims involving relatively small sums of money on an individual basis will be left without a remedy.")

These cases establish that, notwithstanding that some federal courts have rejected superficially similar arguments, there is widespread judicial approval of such principles.

**4.      THE ARBITRATOR NAMED IN THE ARBITRATION AGREEMENT IS BIASED AND PREJUDICIAL AGAINST CONSUMER BORROWERS SUCH AS THE PLAINTIFF.**

The defendants have named the National Arbitration Forum ("NAF") as the arbitrator. It is no surprise the lenders seek to compel arbitration before NAF as this arbitration forum promises the financial services' industry that arbitration before NAF will "make a positive impact on [their] bottom line." NAF achieves what it promises in its advertisements through a decision making system that has an inherent bias toward lenders. Because NAF's business is dependent upon continued referrals from the defendants and other lenders, there is a strong incentive for NAF to favor lenders over consumers and other parties in disputes referred to arbitration before it. It is by no means coincidental that the outcome of NAF arbitration nearly always provides a favorable result for lenders.

There is strong evidence involving NAF that establishes that its Code is not effective in preventing repeat player bias. The repeat player bias became evident in interrogatory answers filed in a civil action filed in Alabama state court by one of NAF's clients, the credit card company First USA. The case is Bownes v. First USA Bank, N.A., civil Action No. 99-2479-PR (Cir. Ct. Montgomery Cty.). The interrogatory answers indicated that First USA had prevailed in

19,618 cases, and the consumer had prevailed in 87 cases in arbitration before NAF. By its own admission, First USA Bank prevailed in 99.6% of its cases while the consumer prevailed in a mere 0.4%.  This result is hardly consisted with NAF's assertion in its letters that it has "the fairest of possible arbitrator selection processes."

This case poses a question of great significance to the plaintiff in the case at bar, to the non-lender party to this litigation, and to many other consumers in Massachusetts:  whether an arbitration clause that designates arbitration before an arbitrator with a strong incentive to favor one side of the controversy (here the corporate lenders over the consumers and the non-lender party) is the sort of arbitration clause that is so unfair, one-sided, and over-reaching as to be unconscionable under M.G.L. Chapter 93A.  While this question is one of first impression in this Court and involves primarily Massachusetts consumer protection laws, it nonetheless stands at the intersection of important and long-standing precedent of the United States Supreme Court. Ward v. Village of Monroeville, 409 U.S. 57, 60-62 (1972).  The resolution of this question requires a new application of important principles from this decision.

In the Ward case, the United States Supreme Court found it unconstitutional for the mayor of a village to exercise the power to levy fines against traffic violators where the mayor had an inherent incentive to act in a particular manner due to his general supervision of the village's finances. See, 409 U.S. at 61-62. The Court should apply this body of constitutional law, previously recognized by this Court and confirmed by the United States Supreme Court, to the common law doctrine of unconscionability. Just as the State may not constitutionally subject an individual to an adjudicative system where the decision maker has a strong incentive to favor one party, it is unconscionable for a company to immunize itself from legal liability by drafting an arbitration clause that subjects the remaining parties to a forum that has an inherent bias in

favor of the company, while at the same time depriving other parties the right to access a court of law.

Alexander Hamilton recognized this fundamental principle during the formative stages of the drafting of the United States Constitution. In *The Federalist No. 79,* Hamilton explains that for the judiciary to be independent, decision makers must be dependent on no one for the means of their support: "a power over a man's subsistence amounts to a power over his will." Thus, those who have power over a decision maker's income, also have the power to shape her or his decisions. This maxim merely represents one aspect of the even more fundamental principle that a decision maker shall be independent. The importance of an independent decision maker is eloquently summarized by Henry T. Lummus, a distinguished member of the Massachusetts Supreme Judicial Court from 1932 to 1955:

> The independence of the judiciary is imperatively necessary for the liberty of every citizen. When judges are not free, no man can be said to have rights, for the forms of justice can be twisted to serve the tyranny of the numerous, the wealthy, the powerful, or the demagogues and schemers who are enabled to govern in their names. Woodrow Wilson said: "So far as the individual is concerned, a constitutional government is as good as its courts; no better, no worse. Its laws are only its professions. It keeps its promises, or does not keep them, in its courts" John Marshall told the Virginia constitutional convention in 1829, "I have always thought, from my earliest youth till now, that the greatest scourge an angry Heaven ever inflicted upon an ungrateful and sinning people, was an ignorant, a corrupt, or a dependent judiciary."

HENRY T. LUMMUS, THE TRIAL COURT 15 (1937).

The United States Supreme Court has embraced this fundamental principle in Ward v. Village of Monroeville, 409 U.S. 57 (1972). In that case, the Court explained the mayor "has general supervision of village affairs. A major part of village income is derived from the finds, forfeitures, costs and fees imposed by him in his mayor's court." 409 U.S. at 58. Even though the mayor did not personally profit from fines levied against alleged violators (unlike the decision makers in NAF), the Court found, "Plainly that 'possible temptation' may also exist

when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." Id. at 60.  In this case, the defendants' arbitration system makes the officials running the NAF (who select the arbitrators and operate the system), and the arbitrators themselves, dependent upon the defendants' continued good will for a steady flow of income.

A significant body of evidence indicates these generally applicable principles are equally true with respect to arbitrators.  As noted above, NAF vigorously competed for defendants' business.  In this competitive marketplace, an obvious implication hangs over NAF's business like a cloud:  were it to rule against the lenders too often (from the lender's viewpoint), or in too great an amount, then lenders could easily take their business to other arbitration service providers.  As one commentator has written.

> [A]rbitrators may be consciously or unconsciously influenced by the fact that the company, rather than the consumer, is a potential source of repeat business.  An arbitrator who issues a large punitive damages award against a company may not get chosen again by that company or others who hear of the award.

Jean Sternlight, Panacea or Corporation Tool?  Debunking the Supreme Court's Preference for Binding Arbitration, 74 Wash. U.L.Q. 637, 685 (1996) (footnote omitted).   The Equal Employment Opportunity Commission, similarly has stated in the employment context, "results cannot but be influenced by the fact that the employer, and not the employee, is a potential source of future business for the arbitration."   Gilbert F. Caselias, Policy Statement on Mandatory Biding Arbitration of Employment Discrimination Disputes as a Condition of Employment. 11 EEOC Compliance Manual at 8 (July 10, 1997); see also Richard C. Rueban, The Dark Side of ADR, Cal. Law. 53, 54 (Feb. 1994) (quoting an attorney experienced in litigation arbitration claims as stating. "Anytime you are paying someone by the hour to decide the rights and liabilities of litigants, and that person is dependent for further business and maintaining good will and those who will bring him business, you've got a system that is corrupt

at its core"); David Schwartz, <u>Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration</u>, 1997 Wisc. L. Rev. 33,61 ("[T]he independent arbitration companies have an economic interest in being looked on kindly by the large institutional corporate defendants who can bring repeat business.").

The principle that the plaintiff asks this Court to uphold today, *nemo debet esse judex in propria causa*—no man may be a judge in his own case—is one that is firmly rooted in the jurisprudence of the Commonwealth of Massachusetts. Under the defendants' arbitration clause, the arbitration forum is designated by only one party, and arbitrators get paid if they hear cases referred to them by lenders such as the defendants, and they vigorously compete with arbitration providers for such lenders to select their services. NAF and its arbitrators have a pecuniary interest in the cases they hear—if they rule against the lenders very often, they will lose that business. Indeed, the defendant lenders testified that if they were dissatisfied with the result with NAF, they would consider switching to another arbitration forum. In short, defendants' arbitration systems encourages arbitrators to rule in favor of creditors, rather than "bite the hand that feeds them."

An arbitration system like the one at issue here, in which arbitrators are compensated through a fee-per-case system and one party selects the decision maker forum, is inherently biased on its face, making the facts concerning any such individual system superficial to the ultimate question. But the practical importance of this legal question becomes clear from the factual record in the <u>Bownes</u> case, which contains substantial evidence that the arbitration service provider at issue in this case, the for-profit NAF, has been profoundly influenced by the market reality that its business depends upon referrals from and the good favor of lenders. The NAF has a history of writing letters soliciting business from lenders, promising to conduct arbitrations under a variety of rules that differ from the practice in court and from those of other

arbitration service providers. A number of these promises sharply favor the lenders' interests and place consumers at an obvious disadvantage. Promising that it is "the alternative to the million dollar lawsuit,"

NAF promises to help lenders improve their bottom line and defeat plaintiffs in what NAF considers a war waged against the consumer. NAF's solicitation letters treat lenders as its ally and consumers as its enemy and counsel lenders on how to defeat their consumers in this battle. NAF has made good on its promises in solicitations by repeatedly entering into litigation between lenders and against consumers as an *amicus*, always making arguments in support of the position of the defendant lenders against individual consumers. See e.g., Brief of *Amicus Curiae* National Arbitration Forum, Marsh v. First USA Bank N.A., No. 00-10648 (5th Cir Dec. 12, 2000).

The NAF has extremely close ties with lenders and its performance exemplifies the wisdom and foresight of the concerns expressed by the United States Supreme Court in Ward and further establishes that the lender defendants' arbitration agreements fall within the category of unconscionable clauses.

The background of the NAF is that it is a for-profit organization operating with approximately twenty-six (26) employees all employed out of a small office in Minnesota. Pursuant to NAF rules, arbitrators are paid on a fee-per-case basis. That is to say, arbitrators only get paid if they hear a case, and they get paid more if they handle more cases. Under the NAF Code of Procedure, parties must select an arbitrator from a list of individuals approved and pre-selected by NAF.

The mechanics of selecting an arbitrator involve a system of strikes that inevitably results in an arbitrator who ultimately is selected solely by the NAF Director. (See NAF Code of Procedure, Rule 21). "The parties are provided with a list of names that is one more than the

number of parties." Each party then gets to make one strike. Left after the strikes would be the one extra arbitrator selected by the NAF. If NAF were to submit a list of arbitrators in which even two had strong ties to corporate lenders, let alone all of them, one of those two would almost certainly end up as the decision maker replacing the courts and the jury system for the case.

NAF distinguishes itself from a court of law to lenders by announcing, quite astonishingly, that decisions by its arbitrators are not based on "equity." NAF rules also limit awards to "the amount of the claim," (see NAF Code of Procedure, Rule 37.B.), prohibiting the recovery of damages based on new evidence discovered during the litigation. By forcing claimants to place a dollar figure on their claim, not only must a consumer sacrifice his right to access the courts, the consumer also waives relief he would be entitled to under the law. NAF only permits consolidation with the agreement of all parties, making it impossible for consumers to band together to bring common claims and it does not permit class actions. *See, e.g.*, Brief of *Amicus Curiae* National Arbitration Forum, <u>Marsh v. First USA Bank, N.A.</u>, No. 00-10648 (5th Cir. Dec. 12, 2000).  NAF Rule 19 of its forum Code of Procedure does <u>Not authorize class actions and specifically prohibits them</u>.

**The plaintiff's claims are not generalized attacks on arbitration, but are unique to the particular system imposed by these lenders on their customers.**

The plaintiff's argument here is not a generalized attack on arbitration, or an attack that is inherent to all arbitration.  The plaintiff does not seek to challenge all arbitrators or arbitration in the abstract.  Rather, the plaintiff argues that a specific arbitration system—one that operates on a fee-per-case compensation system and where one party designates the arbitrator—is inherently biased and unconscionable under Massachusetts law.

It would have been easy for the lender defendants to draft an arbitration clause that did not give the arbitrators a strong incentive to rule for the lender defendants. The agreement could simply provide that the parties would jointly agree on an arbitrator. With clauses of this sort, the arbitration service provider has no incentive to entirely structure its operations to favor the corporation because providers doing so will not be selected by consumers.

5.      **M.G.L. CHAPTER 93A REQUIRES THAT WAIVERS OF SUBSTANTIVE RIGHTS AFFORDED BY CONSUMER PROTECTION LAWS MUST BE CLEARLY AND UNEQUIVOCABLY DISCLOSED AND THAT IN ORDER TO BE ENFORCEABLE, CONSUMERS MUST KNOW WHAT THEY ARE WAIV-ING TO BE ENFORCEABLE.**

To constitute a valid waiver, there must be (1) an existing right, benefit or advantage; (2) knowledge, actual or constructive of the existence of such right, benefit or advantage; and (3) an actual intention to relinquish such right, benefit or advantage. See 28 Am Jur 2d, Estoppel and Waiver, § 154, and <u>Niagra Fire Ins. Co. v. Lowell Trucking Corp.</u>, 316 Mass. 652 (1944).

In the case at bar, the plaintiff had no knowledge, actual or constructive, that he would have the right to file a complaint against the defendant if the defendant violated consumer protection laws. Accordingly, the plaintiff did not know that he was relinquishing any rights. At a minimum, it is suggested that this is a substantial and material question of fact which would bar the enforcement of the Arbitration Agreement.

Waiver, like agency or negligence, is dependent on the totality of circumstances and is not readily decided on affidavits. <u>Bossi v. Whalen</u>, 19 Mass. App. Ct. 966, 473 N.E.2d 1167 (1985).

The principal of waiver will be recognized whenever a party intentionally relinquishes <u>*a known right*</u> or acts in such a manner as to warrant an inference of such relinquishment. It is an equitable principle invoked to further the interests of justice. Waiver, as distinguished from

estoppel, depends upon what one himself does, without regard to its effect, upon the party benefiting from the waiver.

Consumer protection statutes in Massachusetts, particularly G.L. Chapter 93A class actions aggregating statutory damages claims, a potent complement to government enforcement. Class actions successfully challenge the home loan industry, which aggressively expanded from small local businesses to institutional lenders and major national financial organizations, such as the defendants.

The public purposes of classwide enforcement have been evident from the outset. The consumer lending class representative who shepherds a case through complex litigation and, due to the cap on class action damages, receives lesser damages than he would in an individual case, cannot be said to act other than in the public interest. Consumer lending class actions effectively challenged abusive lender practices, such as violating statutory requirements and hiding unconscionable terms, as in this case. Absent classwide enforcement, such abusive practices would continue unchallenged.

Unfortunately, public enforcement actions do not suffice to police home mortgage industry practices. Contrary to industry assertions, regulatory enforcement does not remove the need for class actions. The Federal Trade Commission and the Comptroller of the Currency have primary authority to regulate national banks but both struggle with have limited resources for enforcement.

**Arbitration should not prevent consumers from effectively vindicating their rights under consumer protection laws.**

Courts reviewing arbitration clauses should give due regard to the importance of classwide consumer protection enforcement in preserving statutory rights. Courts must endeavor to effectuate both the substantive rights created by the numerous consumer laws and the policies

of the FAA.  Authorization of classwide consumer lending claims in arbitration would further

both goals.  The Court thus should interpret arbitration clauses to permit classwide arbitration

and refuse to enforce clauses that expressly prohibit classwide proceedings.

Before proceeding to court with a claim under G.L. c. 93A, § 9, a consumer is under no

obligation to exhaust other remedies, including arbitration provisions provided by contract.  See

Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813, 816 (1982).  See also Greenleaf

Engr. & Constr. Co. v. Teradyne, Inc., 15 Mass. App. Ct. 571, 574-575 (1983).  General Laws c.

93A, § 9(6), states as follows:

> Any person entitled to bring an action under this section shall not be required to
> initiate, pursue or exhaust any remedy established by any regulation,
> administrative procedure, local, state or federal law or statute or the common law
> in order to bring an action under this section…. (Underling supplied for
> emphasis.)

See Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. at 826 (provisions of G.L. c. 9A,

§ 9(6), apply to arbitration, which is "comprehended within either 'common law' or statutory

remedies").

BERWIN LOCKWOOD, Individually and on
Behalf of Class Members, Plaintiff

By his Attorney,


/s/ Evans J. Carter
Evans J. Carter (BBO# 076560)
Hargraves, Karb, Wilcox & Galvani, LLP
550 Cochituate Road
P.O. Box 966
Framingham, MA  01701-0966
(508) 620-0140

Dated:   May 11, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BERIN LOCKWOOD, Individually and on
behalf of Class Members,

Plaintiff,

v.

FULL SPECTRUM LENDING, INC. and
COUNTRYWIDE HOME LOANS, INC.,

Defendants

Civil Action No. 05-10647-MLW

**AFFIDAVIT OF BERIN LOCKWOOD
FILED IN OPPOSITION TO THE
MOTION TO COMPEL ARBITRATION**

I, Berin Lockwood, based on personal knowledge, depose and say as follows:

1.    I am the plaintiff in the above-captioned matter and I reside at 14 Everett Street,

Norfolk, Norfolk County, Massachusetts, and I moved here from Ontario, Canada after I closed

on the mortgage with the defendants.

2.    I was living in Canada with my wife and entered into an agreement to purchase a

home on or about July 22, 2004 located at 14 Everett Street, Norfolk, Massachusetts, and I spoke

with Harold Bean of the defendants in order to obtain mortgage financing.

3.    Mr. Bean told me that I could get a 5.25% mortgage loan in the principal amount

of $450,000 and that no rate lock-in agreement or documentation would be needed but , later,

Mr. Bean advised that the best he could do would be 6%.

4.    No good faith estimate of the settlement charges was provided to me, as required

by law, nor was any loan commitment letter sent to me.

5.    At the real estate closing held on August 27, 2004 before Gary F. Kinsella, Esq.

(as closing counsel for the defendants), a classic bait and switch practice was done to me.

6.    The mortgage loan product given to me did not have a rate of interest at 6% fixed

interest for 30 years but, rather, was a strange/hybrid 8.5% margin with a 7.125% floor and a

14.125% ceiling ARM product. The Truth-in-Lending Disclosure Statement at the closing stated an APR of 9.385% with increasingly larger mortgage payments after 36 months.

7.    I felt that I had no choice but to close as I had made firm arrangements to move and I would have lost my home deposit in an amount of $53,000.

8.    Mr. Bean informed me, prior to the closing, that I would not need an attorney at the closing because the defendants' terms were nonnegotiable and the closing attorney would assist me and I relied upon this, to my detriment as I went alone to the closing.

9.    I signed whatever documents that Attorney Kinsella put in front of me but I do not recall signing the Mutual Agreement to Arbitrate Claims dated August 26, 2004 and in which my signature appears on page 3, dated August 27, 2004. I was not given a copy of said Mutual Agreement to Arbitrate Claims.

10.    Neither Attorney Kinsella nor anyone else explained the Mutual Agreement to Arbitrate Claims. I certainly did not read it as it was put in front of me with a large stack of papers and I was only told or instructed where to sign. No one told me that I was waiving any rights that I had or that I must arbitrate all claims. Also, no one  discussed this matter with me before or after the closing and I was surprised that such an agreement existed.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY this ___9___ day of May, 2005.

_____Berin Lockwood_____
Berin Lockwood